■ RICHARD ESPOSITO, Appellant, v NEW YORK CITY INDUSTRIAL DEVELOPMENT AGENCY et al., Respondents. RICHARD ESPOSITO, Appellant, v NEW YORK CITY INDUSTRIAL DEVELOPMENT AGENCY et al., Defendants, and AMERICAN INTERNATIONAL GROUP, INC., et al., Respondents. [760 NYS2d 18] —Order, Supreme Court, New York County (Marcy Friedman, J.), entered October 5, 2001, which, insofar as appealed from, granted defendants' cross motions for summary judgment dismissing plaintiff's claims pursuant to Labor Law § 240 (1) and § 241 (6), affirmed, without costs. Order, same court and Justice, entered April 19, 2002, which granted defendants' American International Group, Inc. and American International Realty Corp. (AIR) motions to renew their motions for summary judgment to the extent of dismissing plaintiff's claim against them pursuant to Labor Law § 200 and dismissing the complaint and all cross claims in their entirety against said defendants, affirmed, without costs.

The Labor Law § 240 (1) claim was properly dismissed; defendants showed that the work plaintiff was preparing to perform, though termed a repair of an air conditioning unit that was not functioning properly, involved only adjustments and replacements of small components, thus falling within the rule enunciated in *Jehle v Adams Hotel Assoc.* (264 AD2d 354 [1999]; *see also Rowlett v Great S. Bay Assoc.*, 237 AD2d 183, 184 [1997], *lv denied* 90 NY2d 809 [1997]).

As to plaintiff's claim under Labor Law § 241 (6), it must fail as plaintiff was not involved in construction, excavation or demolition as contemplated in that statute. The Court of Appeals recently explained in *Nagel v D & R Realty Corp.* (99 NY2d 98 [2002]), that to be covered by section 241 (6), maintenance or repair work must occur "in the context of construction, demolition [or] excavation" (*id.* at 103). The reasoning of previous cases that the word "construction" in Labor Law § 241 (6) includes the broad definition of "construction work" contained in the Industrial Code, namely, "[a]ll work of the types performed in the construction, erection, alteration, repair, maintenance, painting or moving of buildings" (*see* 12 NYCRR 23-1.4 [b] [13]), was rejected by the *Nagel* Court.

Finally, defendants adequately established that plaintiff is a special employee of AIR, while plaintiff's challenge to that showing is unsupported by any proper evidentiary materials. Concur—Andrias, Saxe and Sullivan, JJ.

Mazzarelli, J.P. and Rosenberger, J., dissent in part in a memorandum by Mazzarelli, J.P., as follows: I would modify the first order, entered October 5, 2001, and reinstate plaintiff's Labor Law § 240 (1) claim against defendants New York City Industrial Development Agency (IDA), American International Group (AIG), and American International Realty Corp. (AIR). I would also modify the IAS court's second order, entered April 19, 2002, to deny AIR summary judgment based upon the exclusivity provisions of the Workers' Compensation Law.

Plaintiff, Richard Esposito, was a mechanic employed by TUCS Cleaning Services, Inc. (TUCS) working at a 33-floor commercial building at 175 Water Street in Manhattan. On July 19, 1997, he was injured when he fell from a ladder as he attempted to remove the cover from a large air conditioning unit. As relevant to the issues on appeal, he commenced this action asserting common-law negligence and Labor Law claims against defendants IDA, AIR, and AIG.

AIR, a subsidiary of AIG, purchased the premises on May 1, 1996. On December 31, 1996, IDA purchased the building and leased it back to AIR, pursuant to an agreement which provided a real estate tax benefit to AIR. According to the senior vice-president of AIG, IDA owned the building, and AIR, not AIG, retained exclusive control over all employees involved in its maintenance and operation.

Louis DiGiamo, TUCS' chief engineer, plaintiff's supervisor, swore in his affidavit that AIR exercised direction, control and supervision over plaintiff's work. DiGiamo, who supervised the building's maintenance staff and distributed work assignments, paychecks, and scheduled work shifts, had hired plaintiff prior to AIR's purchase of the building. DiGiamo stated that TUCS was only the payroll processor for the building's maintenance workers, and that all supervision over the maintenance workers was received from AIR. DiGiamo testified that his direct supervisor was James Doherty, property manager for the building. While Doherty did not directly supervise the maintenance staff, he was in charge of reprimanding and firing of mechanics.

Robert Barriero, director of property management for AIR, swore in his affidavit that while maintenance workers, including plaintiff, were employed by TUCS, there was an agreement in effect on the date of plaintiff's accident providing that TUCS employees worked under the sole direction and control of AIR.

That agreement was in the form of an October 1993 letter from AIR to TUCS, which stated, inter alia, "You agree that [AIR] will be responsible for management and direction of the Union Employees and you agree not to interfere in any manner." AIR was also responsible, under the agreement, for all of TUCS' expenses concerning employment of maintenance workers in the building, including wages, taxes, union benefits, workers' compensation insurance and other related expenses. The president of TUCS, Sergio Artazu, swore in his March 2001 affidavit that while the written contract between AIR and TUCS expired on August 31, 1994, the parties continued to operate under its terms pursuant to a verbal agreement.

In July 1997, plaintiff's job duties included repairs to machines, equipment, compressors and air conditioning units. He also did plumbing, ceiling tile replacement and grout work. DiGiamo stated that it had always been plaintiff's primary responsibility to perform preventative maintenance on the building's air conditioning units. Plaintiff typically worked from 4 P.M. to 12 A.M. On July 19, 1997, he worked an overtime shift which started at midnight. He was assigned to perform the monthly maintenance check of the air conditioning units on the 22nd through 29th floors, including taking amperage readings, and checking belts, sheaves and bearings, looking for any problems. If a unit was malfunctioning or not operating properly, plaintiff was responsible for repairing it.

The air conditioning units are approximately 20 feet long and 10 to 15 feet high. There is a cover, measuring about eight feet long and three feet wide, and weighing approximately 75 pounds, on top of each unit. It is necessary to remove this cover to access the air conditioner's interior components.

Plaintiff had finished his inspection of all of the units above the 22nd floor prior to his accident. He climbed the ladder, removed the cover from the 22nd floor unit, and found that it had a low amperage reading, which indicated malfunction. The unit was also vibrating heavily, the motor bearing appeared worn, the belts were chewed up, and the motor was loose. Plaintiff testified that the broken belt indicated a possibility that the motor pulley was broken.

Plaintiff replaced the cover to the unit and cleaned the machine. He then went down to the mezzanine level to collect repair tools, including a replacement motor pulley and belts, and returned to the 22nd floor. He placed a six-foot, A-frame ladder against the unit. Plaintiff did not open the ladder because there was not enough room between the unit and the wall. Plaintiff climbed to the fourth or fifth rung, and as he

removed a screw, the top of the cover started to come down. As he attempted to push it back, the bottom of the ladder kicked out, and plaintiff fell, sustaining injuries.

Subsequent to the filing of the complaint and service of the answers, defendants separately moved for summary judgment on a number of different grounds, and plaintiff cross-moved for partial summary judgment on his Labor Law § 240 (1) claim. In support of plaintiff's cross motion, he submitted an affidavit from an engineering consultant, Patrick J. McDonald, who reviewed plaintiff's deposition testimony and gave his expert opinion that plaintiff was engaged in "repair" of a malfunctioning air conditioning unit when his accident occurred because he was correcting the operation of its primary components.

The IAS court granted IDA, AIR, and AIG summary judgment dismissing plaintiff's Labor Law § 240 (1) claims, and it denied plaintiff's cross motion for partial summary judgment. Relying on this Court's decision in *Jehle v Adams Hotel Assoc.* (264 AD2d 354 [1999]), the court held that plaintiff's work indisputably involved routine maintenance, not within the scope of Labor Law § 240 (1). The IAS court also granted AIR's and AIG's motions for summary judgment dismissing plaintiff's Labor Law § 241 (6) claim.

The IAS court initially denied AIR's motion for summary judgment, upon the theory that plaintiff was its special employee and, therefore, barred from recovery under any of the Labor Law provisions, having received workers' compensation benefits. The court noted that AIR had failed to submit its agreement with TUCS, which, in any event, expired as of August 31, 1994. The court noted that both plaintiff and his supervisor believed that they were AIG employees. However, upon renewal, the IAS court granted AIR summary judgment, finding that a "special employee relationship" had been demonstrated as a matter of law.

The court also initially denied that branch of AIG's motion to dismiss plaintiff's Labor Law § 200 claim, holding that while AIG had established that it did not own the premises, it had failed to eliminate triable issues as to whether it controlled plaintiff's work. Upon renewal, the court granted this defendant's motion to dismiss the section 200 claim.

*Discussion*

Section 240 (1) of the Labor Law, entitled "Scaffolding and other devices for use of employees," requires that all contractors and owners, "in the erection, demolition, *repairing*, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for

the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed" (emphasis supplied). The legislative purpose behind this enactment is to protect "workers by placing 'ultimate responsibility for safety practices at building construction jobs where such responsibility actually belongs, on the owner and general contractor' (1969 NY Legis Ann, at 407), instead of on workers, who 'are scarcely in a position to protect themselves from accident' (*Koenig v Patrick Constr. Corp.*, 298 NY 313, 318 [1948])" (*Zimmer v Chemung County Performing Arts*, 65 NY2d 513, 520 [1985]). Moreover, section 240 (1) "is to be construed as liberally as may be for the accomplishment of the purpose for which it was thus framed" (*Quigley v Thatcher*, 207 NY 66, 68 [1912]) and it imposes strict liability for a breach that has proximately caused an injury (*Zimmer, supra* at 521).

While courts have held that Labor Law § 240 (1) does not apply to routine maintenance, or replacement of small defective parts of machinery in a nonconstruction, nonrenovation context (*Jehle, supra; see Smith v Shell Oil Co.*, 85 NY2d 1000 [1995]; *Wilson v City of New York*, 89 F3d 32 [1996]; *Stadtmuller v Metropolitan Life Ins. Co.*, 271 AD2d 361 [2000]; *Papapietro v Rock-Time, Inc.*, 265 AD2d 174 [1999]; *Koch v E.C.H. Holding Corp.*, 248 AD2d 510 [1998], *lv denied* 92 NY2d 811 [1998]; *Rowlett v Great S. Bay Assoc.*, 237 AD2d 183 [1997], *lv denied* 90 NY2d 809 [1997]), it protects workers who are injured while "repairing" an object that is either inoperable or malfunctioning (*Caraciolo v 800 Second Ave. Condominium*, 294 AD2d 200 [2002]; *Franco v Jemal*, 280 AD2d 409 [2001]; *Craft v Clark Trading Corp.*, 257 AD2d 886, 887 [1999] ["the paramount issue becomes whether the item being worked on was inoperable or malfunctioning prior to the commencement of the work"]; *Fuller v NC3, Inc.*, 256 AD2d 1126 [1998]).

Here, as in *Jehle*, the plaintiff was employed to conduct air conditioner maintenance. However, in *Jehle*, the plaintiff was "correcting the airflow, replacing the filters, cleaning the coil, replacing a broken belt and adjusting a worn pulley" (264 AD2d at 354) at the time he was injured, and we held that "replacement of parts that wear out routinely should be considered maintenance, outside the purview of Labor Law § 240 (1)" (*id.* at 355).

The substantive proof offered in support of plaintiff's motion, and the chain of events preceding this plaintiff's accident, distinguish this case from *Jehle*. First, plaintiff's expert submit-

ted an affidavit opining, from plaintiff's description of the air conditioning unit's problems, it was vibrating very badly, the "motor bearing looked worn," "the belts were chewed up" and "the motor was loose," that the 22nd floor air conditioning must have been broken, or at least malfunctioning, when plaintiff first attempted to service it. Plaintiff's expert stated that, "In contrast to repair, the fundamental notions of preventative maintenance are that the work is normally required through a scheduled review of a machine or unit, and work is performed in anticipation of a subsequent breakdown of the machine * * * . The work Mr. Esposito was performing on the date of his accident was not part of regularly scheduled maintenance, but an unanticipated repair due to the malfunction of several primary parts of the unit." He concluded that, "It is my opinion based upon a reasonable degree of engineering certainty and based upon my expertise in the field of air-conditioning service and repair that the replacement of a pulley, a belt, and the minimization of vibration constituted a repair and not regular maintenance." Unlike the facts of *Jehle*, here the plaintiff had to go to another floor to get additional tools, some of which he needed, others of which he may have needed, to attempt to restore the unit to working order, a task he was not sure he could complete by himself. Plaintiff testified that he was unsure of the cause of the various problems with the air conditioner unit, and that he intended to replace broken belts, tighten a sheave and, if necessary, replace the motor pulley. Moreover, plaintiff testified that if he discerned that a bearing had to be replaced, he could not do this job alone. The scope of the repair required here was unknown at the time plaintiff was injured, unlike the proposed replacement of small component parts described in *Jehle*. This case presents outstanding factual issues which preclude our determination, as a matter of law, at this point in the litigation, that plaintiff was involved in routine maintenance at the time he was injured (*Short v Durez Div.-Hooker Chems. & Plastic Corp.*, 280 AD2d 972 [2001]; *see also Sprague v Peckham Materials Corp.*, 240 AD2d 392 [1997]). Accordingly, I would reinstate plaintiff's Labor Law § 240 (1) claims against IDA, AIG and AIR.

*Was Plaintiff Engaged in "Construction Work" Within the Meaning of Labor Law § 241 (6)?*

In *Nagel v D & R Realty Corp.* (99 NY2d 98 [2002]), the Court of Appeals explained that the protections afforded by Labor Law § 241 (6) only apply to plaintiffs who are performing maintenance or repair work "in the context of construction, demolition and excavation" of a building or structure (*id.* at

103). In that case, the plaintiff was performing inspection and maintenance work on an elevator in an existing building, and the *Nagel* Court specifically rejected the contention, raised by plaintiff here, that section 241 (6) incorporates by reference a rule promulgated by the Industrial Board of Appeals, which defines construction as including maintenance work (*id.*). As it is uncontested that plaintiff was not working on a "construction, demolition [or] excavation" project, *Nagel* precludes any claim under Labor Law § 241 (6).

*Was Plaintiff a Special Employee of AIR?*

In *Thompson v Grumman Aerospace Corp.* (78 NY2d 553, 557 [1991]), the Court of Appeals stated that, "a general employee of one employer may also be in the special employ of another, notwithstanding the general employer's responsibility for payment of wages and for maintaining workers' compensation and other employee benefits. A special employee is described as one who is transferred for a limited time of whatever duration to the service of another. General employment is presumed to continue, but this presumption is overcome upon clear demonstration of surrender of control by the general employer and assumption of control by the special employer" (citations omitted). The Court of Appeals continued to state that while a person's categorization as a special employee is usually a question of fact, where "the uncontroverted record documents an employer's comprehensive and exclusive daily control over and direction of the special employee's work duties for almost a full year with the corresponding complete absence of any supervision or control of his work duties by the originating general employer" (*Thompson, supra* at 557), the issue can be determined as a matter of law.

The IAS court concluded that defendants had established that the expired written contract between TUCS and AIR, which indisputably established AIR's *exclusive* supervision and control over TUCS employees in the building, was still in effect on the date of plaintiff's accident, and that the contract met the requirements for finding that a special employment relationship existed, as a matter of law, as described in *Thompson*. However, it is undisputed that plaintiff was supervised and controlled by TUCS employees and that he received his salary from TUCS, facts refuting the implication that TUCS had relinquished control over him (*see Brunetti v City of New York*, 286 AD2d 253 [2001]; *Short*, 280 AD2d at 972). Because plaintiff's categorization is a matter for jury determination here, I would reinstate his claims against AIR.

*Is AIG liable under Labor Law § 200?*

Labor Law § 200 codifies the common-law duty imposed upon an owner or general contractor to maintain a safe construction site (*Rizzuto v L.A. Wenger Contr. Co.*, 91 NY2d 343 [1998]). However, "an implicit precondition to this duty is that the party to be charged with that obligation 'have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition'" (*id.* at 352 [citation omitted]). Because it is undisputed here that AIG did not own the building at the time of plaintiff's accident, and there is no evidence that AIG had any supervisory responsibility for the property (*see Buccini v 1568 Broadway Assoc.*, 250 AD2d 466 [1998]), plaintiff's Labor Law § 200 claim against defendant AIG was properly dismissed.